663 So.2d 162 (1995)
Danny URIEGAS, et al., Plaintiffs-Appellants,
v.
GAINSCO, et al., Defendants-Appellees.
No. 94-1400.
Court of Appeal of Louisiana, Third Circuit.
September 13, 1995.
Writ Denied December 15, 1995.
*165 Silas B. Cooper Jr., Abbeville, for Danny Uriegas et al.
Lisa Cloutier McCowen, Lafayette, for Gainsco, et al.
Before KNOLL, COOKS, and PETERS, JJ.
KNOLL, Judge.
This case addresses the fatality of Sylvia Uriegas (Sylvia) arising out of a motorist/pedestrian accident involving her ex-husband, Jerry Uriegas (Jerry). Plaintiffs, Danny Louis Uriegas (Danny), individually, and as the duly appointed provisional tutor of his minor sisters, Patricia Elaine Uriegas and Anna Marie Uriegas, filed suit for the wrongful death of their mother, Sylvia, against Jerry, the plaintiffs' father. The plaintiffs also named Intracoastal Liquid Mud, Inc. (ILM), Jerry's employer, and ILM's insurer, Gainsco, as defendants. Danny also presented a personal claim for the negligent infliction of emotional distress under La.Civ.Code art. 2315.6 and Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990).
The trial lasted two weeks. After hearing the evidence presented by both parties, the jury deliberated for two hours and ten minutes and returned a 9-3 verdict in favor of the defendants. The plaintiffs appeal, presenting two issues: (1) the jury committed manifest error when it ruled in favor of the defendants and found that Jerry Uriegas was not negligent; and (2) the district court erred when it failed to grant the plaintiffs' motion for a new trial because of alleged jury misconduct. We affirm.

Facts
On Saturday evening, April 11, 1992, beginning at approximately 7:30 p.m., the decedent, Sylvia, and her friend, Frances Trahan Abate, went to several bars in Abbeville in search of Sylvia's ex-husband, Jerry, an experienced truck driver who worked for ILM driving an 18 wheeler vacuum truck. That same night, Sylvia contemplated renewing her relationship with her ex-husband; they had been divorced approximately two years. Along the way and while searching in several bars for her ex-husband, Sylvia consumed alcoholic beverages.[1] Unable to find her ex-husband, who was then working his shift that night at ILM, Sylvia returned at approximately 11:30 p.m. to her apartment at Chapel Downs, located near Louisiana Highway 14 a/k/a West Port Road in Abbeville.[2] Once there, Sylvia conveyed her intention to reconcile with her ex-husband to her son, Danny, who was then on leave from military service with the Navy.
Danny responded negatively to his mother's idea and told her that he had heard that Jerry, his step-father, had been seen at an area video store holding hands with another woman. To this, Sylvia indignantly replied, "I can't believe it. I can't believe it. We were supposed to get back together."
Hoping to confront her ex-husband with the rumor, Sylvia attempted to contact Jerry at ILM. However, she was unable to talk with Jerry because he was out on a job. Instead, Sylvia spoke twice with Willard Buford, a dispatcher at ILM. To assure that her ex-husband would call her back, Sylvia fabricated a story. She told Mr. Buford that there was an emergency and that Jerry's brother had been killed.
Shortly thereafter, Sylvia received a telephone call from Ms. Abate, the friend who had earlier gone drinking with her. During this telephone conversation, Sylvia fumed about the rumor concerning the woman at the video store and told Ms. Abate that she had left messages at ILM which would assure that Jerry would respond to her calls. Sylvia also related to Ms. Abate that she was still "buzzing" from her earlier alcohol consumption and that she intended to ride with Jerry to his next job after he arrived at her apartment.
*166 When Jerry returned to ILM, the dispatcher gave him Sylvia's messages. Jerry telephoned Sylvia, but she refused to talk about the emergency on the phone and requested that Jerry immediately come to her apartment. Still on the job, Jerry loaded his vacuum tanker with 80,000 pounds of drilling mud and drove to Sylvia's apartment, which was en route to the drilling rig site where Jerry was to deliver the mud.[3]
When Jerry arrived at Sylvia's apartment complex, it was dark and there was a patchy, heavy fog. Jerry parked his 18 wheeler 3.5 feet off the north, right hand shoulder of Louisiana Highway 14's west bound lane, across from the 345.5 foot driveway that traveled generally in a southerly direction to the Chapel Downs apartment complex.[4] Kane Marceaux, who was sitting with his girl friend on the steps of his sister's house which was located off the north shoulder of the highway, watched Jerry park his truck and was able to approximate its general position on the shoulder when asked to do so at trial. Before exiting his truck, Jerry made sure that the yellow marker lights along both sides of the truck and the flashing red caution lights to the rear of his truck were lighted. Jerry then crossed the east and west bound lanes of Louisiana Highway 14, approximately 23 feet wide, and proceeded down the driveway that led to his ex-wife's apartment.
Immediately after Jerry reached Sylvia's apartment to inquire about the emergency, Sylvia interrogated him about the rumor that Danny had told her concerning the woman at the video store. Quickly learning that the emergency concerning his brother's death had been fabricated by his ex-wife, Jerry attempted to leave the apartment complex and return to his truck so that he could complete his scheduled delivery assignment for ILM. He told Sylvia that he would return to discuss this matter with her after he completed his job. However, Sylvia tried to hamper her ex-husband's departure and followed him down the driveway leading to the Chapel Downs apartment complex.
During their trek down the driveway, Sylvia and Jerry argued bitterly and even exchanged blows. These events attracted the attention of Robert Fish, a fellow resident of Chapel Downs and a retired dump truck driver, who saw Jerry first arrive at the apartments and witnessed the commotion. He saw Sylvia strike Jerry in the face and afterwards saw Jerry retaliate by pushing Sylvia to the ground. Despite Sylvia's attempts to prevent his departure, Jerry was able to reach the end of the driveway, cross Louisiana Highway 14, and enter the cab of his truck.
Sylvia followed Jerry to the truck and entered the cab of the truck from the passenger's side door, which was unlocked. Once inside the cab of the truck, Sylvia demanded to know the identity of the woman at the video store and tried to provoke Jerry's answer by attempting to destroy his CB-radio, transmission, and other costly electrical equipment. Jerry stopped Sylvia and forcefully removed her from the cab. He then placed her atop and across his shoulders and carried her half way down the length of the 345.5 foot driveway to the Chapel Downs apartment complex.
Meanwhile, the presence of the 18 wheeler, the hostile confrontations between Sylvia and Jerry, and the sight of a woman being carried atop a man's shoulders attracted the attention of another Chapel Downs resident, Mildred Brown. Suffering from insomnia, Ms. Brown was watching these events at approximately 12:30 a.m. While carrying Sylvia atop his shoulders, Jerry shouted twice for someone to call the police. Jerry's pleas were witnessed by Ms. Brown, who also heard Sylvia respond: "I'll behave. I'll be quiet. I'll behave." Jerry put Sylvia down and promised her that he would return to talk with her after he finished work.
*167 Thereafter, from different vantage points at the apartment complex, Robert Fish and Ms. Brown both witnessed Sylvia walking toward her apartment in the opposite direction and away from Jerry. They both then saw Jerry turn around and quickly run back down the length of the driveway to his truck. When Ms. Brown saw Jerry reach the latter half of the driveway, she testified that she saw Sylvia turn around away from her apartment and proceed down the driveway after her ex-husband, who had by that time reached his truck. Robert Fish stated: "Then, all of a sudden, she stopped, turned around and ran back toward the driveway and headed out."
Puzzled by Sylvia's actions and because he did not think that she had time to make it down the driveway and catch the truck before it left, Robert Fish exited his upstairs apartment and walked downstairs to see what was transpiring and why Sylvia was running down the driveway after the truck.
Once in the truck, Jerry testified that he started the truck's engine, released the air brakes, and turned on the headlights. Ms. Brown testified that she saw the illumination of the truck's headlights and heard the "crunch" of the truck's gears being placed in motion to begin its take-off. As Jerry moved off the shoulder onto the west bound lane of Louisiana Highway 14, Ms. Brown testified that Sylvia stopped at the end of the Chapel Downs driveway and did not at that time enter the travel portion of the road. Ms. Brown saw Sylvia stop at the end of the driveway as the truck was leaving, and because she thought that the commotion was over, she went to bed.
In the time that it took Robert Fish to leave his upstairs apartment and walk down the stairs to observe the truck and Sylvia's actions, the truck had pulled off the shoulder and was traveling in a westerly direction down Louisiana Highway 14. Once Robert Fish arrived at the end of the stairs, he testified that he looked for Sylvia, did not see her, and presumed that she had indeed made it to the truck in time and had left with it. Neither Robert Fish nor Ms. Brown witnessed the actual accident which brought Sylvia to her death. Although he did not see the accident, Mr. Marceaux, the man who had earlier watched Jerry park his truck, testified that he heard the sound of flying gravel, the roar of the truck's diesel engine, and the sound of the truck's gears as Jerry departed from the shoulder.
Before pulling off the shoulder onto Louisiana Highway 14, Jerry testified that he looked into his driver's side mirror and saw the reflection of headlights from a distant vehicle traveling in the west bound lane and approaching him from the east. Seeing that the approaching vehicle was far enough away to initiate his take-off, he leaned forward to gauge the position of a vehicle also parked on the shoulder to the right and in front of his truck because the large hood of his 18 wheeler blocked his view. Jerry testified that he then slowly released the truck's clutch as he leaned forward to gauge the clearance of the vehicle parked in front of him when he began his take off. As the truck lurched forward into the west bound lane of Louisiana Highway 14, Jerry, still leaning forward, observed Sylvia through his driver's side window. Through the now moving truck's driver's side window, Jerry testified that he saw Sylvia running toward his truck, but that Sylvia was still well enough away because she was only half way down the 345.5 foot driveway. Jerry completed his departure from the shoulder and proceeded westerly along Louisiana Highway 14 until he reached the first stop sign.
Jerry testified that his take off felt normal and that he did not feel any unusual sensations beyond the regular shifting of his liquid cargo as it sloshed inside the truck's vacuum tank. He traveled westerly down Louisiana Highway 14 until he reached the first stop sign. Upon reaching the stop sign, Jerry, recalling a past incident when Sylvia had managed to surprise him by stowing away aboard his truck by attaching herself to the rear outside cab, stopped to search for Sylvia. As he told Officer Jason Hebert, one of the Abbeville Police officers who investigated the accident, he stopped at the stop sign because he suspected that Sylvia had attempted to grab his truck. After inspecting his truck and finding nothing unusual, Jerry *168 went to his delivery location to drop off his liquid cargo.
While Jerry worked at the delivery sight, Sylvia's body was discovered lying face down in the travel portion of the roadway by the drivers of two vehicles traveling down Louisiana Highway 14. When Jerry was informed about the accident, he immediately returned to the accident scene and was questioned by the Abbeville Police Officers who had arrived earlier at 12:45 a.m. Sergeants Steve Broussard and George Williams, both investigators with the Abbeville Police Department, investigated the accident scene.
Sergeant Broussard inspected the area, including Jerry's truck, for the presence of human tissue and blood. He testified that he did not find any evidence of human tissue or blood on the front of the truck. This was confirmed by George Skeiro, the laboratory expert who tested the samples collected for the presence of human tissue. Sergeant Williams testified that he participated in the investigation by measuring, interviewing witnesses, and taking most of the photographs introduced into evidence.
Trooper Glenn Stutes, a state police officer with 13½ years experience and training in accident reconstruction, arrived at the accident scene at 2:47 a.m. With the assistance of Sergeants Broussard and Williams, Trooper Stutes headed the data collection portion of the investigation. He collected evidence from Jerry's truck and recorded the truck's dimensions. He then created an after-accident situation map which diagramed the accident scene by recording the distance of each piece of evidence from a fixed reference point. Trooper Stutes fixed the location of Sylvia's body lying on the pavement by creating an outline of it using spray paint. He also measured the length, point of origin, and the angle of the tandem fluid tire tracks[5] found leaving her body at the accident scene.
The tandem tire tracks originated from Sylvia's body at a four degree angle and proceeded in a westerly direction along the westbound lane of the highway. Trooper Stutes testified that the tire tracks had been made by the driver's side tandem drive axle tires of Jerry's truck. Because there was no physical evidence showing the exact location of the vehicle when it was parked on the shoulder, Trooper Stutes was unable to calculate the vehicle's speed at the point of impact. Trooper Stutes also testified that he did not find any evidence of tissue on the substrate of the road, only blood near Sylvia's body, and a blood splatter located six feet to the east of where her body rested. However, Sergeant Broussard testified that he recalled seeing tissue deposited on the road in the area between the blood splatter and the body, but he neither took samples nor photographs of it.
Dr. Ardly Hebert, Coroner of Vermilion Parish, testified that Sylvia died at approximately 12:40 a.m., immediately after sustaining multiple trauma to her body from severe crushing blows which had such force as to propel liver tissue through her mouth. Dr. Hebert hired Dr. Emil Laga, a forensic pathologist, to conduct the autopsy. Dr. Laga testified at trial and discussed the findings from his autopsy report. Dr. Laga limited his testimony to describing the types of multiple trauma that caused Sylvia's death. Dr. Laga offered no opinion as to the events that caused the accident.
Because no one witnessed the actual accident, both the plaintiffs and the defendants hired accident reconstruction experts to recreate the events of the accident scene using data from the after-accident situation map, police reports, photographs, autopsy, witness testimony, and data collected by the experts themselves. The plaintiffs hired Richard Fox, a former Louisiana State Trooper who had investigated and worked as an accident reconstruction expert for over twelve years. The defendants hired James Raymond Locke, an accident reconstruction specialist and retired faculty instructor of seventeen years at the Texas Transportation Institute at Texas A & M. The plaintiffs also introduced as demonstrative evidence a scale model of the truck and the accident scene built by Ceary B. DiBall, an expert model *169 builder who reconstructed the accident scene from police reports and depositions. Both the plaintiffs and the defendants' experts relied upon and used this expertly crafted model at trial.
Both sides offered different explanations for the cause of the accident. The defendants argued that Sylvia's death was caused by her own negligence. They assert that she was caught under the truck's driver's side drive axle tires after she crossed the eastbound lane of Louisiana Highway 14 and entered the travel portion of the westbound lane while chasing after the truck in an attempt to jump onto it. The defendants also emphasized that Sylvia's judgment was impaired because she was under the influence of alcohol. On the other hand, the plaintiffs argued that Sylvia's death was caused solely by Jerry's failure to observe Sylvia standing next to the truck on the north shoulder before he began his take off.
The plaintiffs' expert, Mr. Fox, opined that Sylvia had safely crossed Louisiana Highway 14 and stood on its north shoulder in front of Jerry's truck before it began to move. He theorized that Sylvia was first struck by the front driver's side of the truck while she stood next to the truck on the north shoulder. Mr. Fox also opined that the truck entered the roadway at a thirty-two degree angle as indicated by the tread marks found on Sylvia's body. After being struck by the front of the truck, Mr. Fox suggested that Sylvia's body had been dragged to the position where her body finally rested and was only then run over by the truck's driver's side tandem axle tires. To support his theory, Mr. Fox primarily relied upon two pieces of evidence: (1) the presence of the blood splatter discovered 3.7 feet away from the north shoulder and to the east of Sylvia's body; and (2) superficial abrasions found on Sylvia's body by Dr. Laga.
Mr. Fox argued that the blood splatter demonstrated that the decedent was first hit by the truck while standing on the north shoulder out of the travel portion of the roadway. Mr. Fox further reasoned that the superficial abrasions found on the decedent's body suggested that her body had been dragged to its final resting position, where the truck's drive axle tires crushed it. Mr. Fox also disagreed with the defendants' theory that Sylvia had been caught in the truck's drive axle tires after running into the road and chasing along side the truck because he opined that if Sylvia had been running toward the truck when she was struck then she would have been thrown on her back, not face down, the way her body was discovered.
Under cross-examination, Mr. Fox admitted that there was no physical evidence found on the pavement or the truck supporting his theory or showing that Sylvia had been struck by the front of the truck or anything but the driver's side drive axle tires. Mr. Fox further conceded that he did not consider Ms. Brown's testimony introduced at trial that Sylvia had come to a complete stop at the end of the Chapel Downs driveway as Jerry's truck began its take-off.
After presentation of the plaintiffs' case, the defendants countered the plaintiffs' version of the accident with their own accident reconstruction expert, Mr. Locke. Mr. Locke argued that Mr. Fox's theory placing Sylvia on the north shoulder of Louisiana Highway 14 before the truck began its motion was erroneous for several reasons. First, he theorized that the blood splatter had been left on the pavement only after Sylvia had been crushed by the drive axle tire in the travel portion of the road. Mr. Locke opined that the blood splatter was created after Sylvia's left leg ruptured, as also indicated by Dr. Laga's testimony, from the pressure caused by the great weight of the tires which crushed her body, throwing a stream of blood to that location.
Second, Mr. Locke attacked Mr. Fox's theory that Sylvia's body had been dragged to its final location. He emphasized that the superficial abrasions relied upon by the plaintiffs were not sufficient to show that the body had been dragged to its final resting place. Mr. Locke opined that if the decedent's body had been dragged then the abrasions would have been greater and would have left tissue deposits on the rough pavement. To support his theory, Mr. Locke relied upon Trooper Stutes' testimony that he did not find any evidence of tissue deposited in the area between the blood splatter *170 and the resting place of the body. Mr. Locke also argued that the blood splatter would have been smeared if Sylvia's body had been dragged. Mr. Fox admitted that the blood splatter did not appear to be smeared and that the blood splatter could have been caused when Sylvia's leg ruptured after her body was crushed under the weight of the truck's tires.
Third, Mr. Locke disagreed with Mr. Fox's conclusion that the truck could have entered the roadway at a thirty-two degree angle. Mr. Locke testified that it was impossible for the truck to have entered the road at that angle given the truck's dimensions and turning radius within the limited distance from the shoulder to the resting location of the decedent's body. He thought that the angle of entry was more likely eight or nine degrees.
Mr. Locke also attacked Mr. Fox's assumption that Sylvia's body should have been found resting on its backside to support the defendants' theory that Sylvia had been caught in the truck's drive axle tires after running into the road and chasing alongside the truck. Mr. Locke opined that Sylvia's body could have been spun around after the spinning force and weight of the truck's drive axle tires traveled over her body. He also suggested that the face down position of the body proved that the decedent had to have been running in a forward direction after and alongside the truck when she was caught in the drive axle tires.

LAW AND DISCUSSION

Jury Misconduct
The plaintiffs contend that the district court should have granted their post-verdict motion for a new trial because jury misconduct precluded the impartial administration of justice. They argue that one juror improperly discussed the case with a friend, an attorney, and also a private detective. The friend, who rode with the juror to the trial and ate lunch with him each day of the trial, allegedly remained in the courtroom when the jury was removed and conveyed information to the juror which was not admitted into evidence and withheld from the rest of the jury. They further attest that this juror improperly used this information to influence other members of the jury and generally dominated the other jurors during their deliberation.
The district court judge denied the plaintiffs' motion for new trial after conducting a hearing of this matter. The district court judge also provided written reasons for his ruling. A decision to deny a motion for new trial based upon jury misconduct is reviewed pursuant to an abuse of discretion standard. Wright v. Hirsch, 560 So.2d 835 (La.1990). Peremptory grounds for granting a new trial in a civil jury case are present if it is shown that the jury was bribed or behaved improperly so that impartial justice has not been done. La.Code Civ.P. art. 1972(3). Otherwise, a trial judge is granted wide discretion in allowing or denying the motion. La.Code Civ.P. art. 1973. Improper behavior by a juror or jury is not defined and must be determined by the facts and circumstances of each particular case. Green v. Dupre, 520 So.2d 761 (La.App. 3 Cir.1987), writ denied, 522 So.2d 568 (La.1988); Blandino v. Brown Erection Co., 341 So.2d 577 (La.App. 2 Cir.1977).
The possibility that the decision making process was tainted by an outside influence should not be overlooked as insignificant. Willis v. Louisiana Power & Light Co., 524 So.2d 42 (La.App. 2 Cir.), writ denied, 525 So.2d 1059 (La.1988). However, not every instance of jury misconduct necessitates the granting of a new trial. Gormley v. Grand Lodge, 503 So.2d 181 (La.App. 4 Cir.), writ denied, 506 So.2d 1227 (La. 1987). Instead, the burden falls upon the mover to prove that the level of behavior was of such a grievous nature as to preclude the impartial administration of justice. Id.
It is well-settled that affidavits and other testimony by jurors cannot be used as evidence to impeach their verdict. La.Code Evid. art. 606; Pitts v. Bailes, 551 So.2d 1363 (La.App. 3 Cir.1989), writs denied, 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La.1990); Theriot v. Theriot, 622 So.2d 257 (La.App. 1 Cir.1993); Coleman v. Brooks, 583 So.2d 133 (La.App. 4 Cir.1991). Furthermore, invasive *171 scrutiny of a juror's individual deliberation or investigation of a jury's collective reasoning for reaching a verdict are disfavored in the law as a matter of public policy. The reason for this rule is to promote the jury's discovery of the truth by preventing litigants from invading the privacy of the jury room. See Ryals v. Home Ins. Co., 410 So.2d 827 (La. App. 3 Cir.), writs denied, 414 So.2d 375, 376 (La.1982). As set forth by this court in Renz v. Texas & Pac. Ry. Co., 138 So.2d 114, 123-4 (La.App. 3 Cir.1962):
`While matters of impeachment extrinsic to the verdict may, according to the view of many courts, be shown by the testimony of jurors, it is a long-established and generally accepted doctrine, except where modified by statute, that testimony or affidavits of jurors impeaching a verdict rendered by them will not be received where the facts sought to be shown are such as inhere in the verdict.
`The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterwards. It is to prevent over-zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of oath.
`Testimony of the jurors to impeach their own verdict is not excluded because it is irrelevant to the matter in issue, but because experience has shown that it is more likely to prevent them to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman. The rule that a verdict cannot be impeached by the testimony of a juror is generally adhered to where it is sought to impeach a verdict on grounds of misconduct on the part of the juror or his fellow jurors, despite apprehension expressed in many cases that such rule sometimes serves the cause of injustice. In some jurisdictions the rule has been changed by statute allowing affidavits of jurors for the purpose of impeachment of a verdict on the ground of misconduct of the jury. It seems, moreover, to be a recognized limitation in many jurisdictions that if the foundation can be laid by testimony aliunde that the jurors were guilty of such misconduct as to warrant setting aside the verdict, evidence of the jurors in corroboration and in amplification thereof may be heard.' (Citations omitted).
We have reviewed the entire record pertaining to these proceedings and find no abuse of discretion in the district court's finding that impartial justice was done in this case and in its decision to deny the plaintiffs' motion for new trial based upon jury misconduct. When the record reasonably supports the jury's verdict, overly restrictive scrutiny into a juror's or jury's conduct and deliberations would only serve to erode the finality of a trier of fact's decision and thus reduce confidence in the judicial process.

Appellate Review of Pedestrian/Motorist Accidents
Louisiana law does not impose absolute or strict liability upon a motorist involved in a collision with a pedestrian. Aetna Cas. & Sur. Co. v. Nero, 425 So.2d 730 (La.1983). Motorists are not the insurers of pedestrians' safety. Puearry v. Department of Pub. Safety, 496 So.2d 1372 (La.App. 3 Cir.1986). However, a motorist is statutorily obligated to exercise due care to avoid colliding with any pedestrian upon the roadway and must give warning to the pedestrian by sounding the horn when necessary. Furthermore, a motorist must exercise proper precaution upon observing any child or any confused or incapacitated person upon a highway. La.R.S. 32:214.
The fact that an accident occurs does not create a presumption of negligence in *172 favor of either the pedestrian or motorist. Accidents occurring between a pedestrian and a motorist are governed by the principles of comparative fault. La.Civ.Code art. 2323; Turner v. New Orleans Pub. Serv. Inc., 476 So.2d 800, 803 (La.1985). Therefore, a determination of negligence in motorist/pedestrian accidents rests upon the particular facts and circumstances of each case. See Myles v. Turner, 24,198 (La.App. 2 Cir. 1/19/94); 632 So.2d 384.
The driver of a vehicle bears a greater responsibility to avoid pedestrian/motorist accidents because the consequences of his fault present the potential for causing the greater havoc. Turner, supra. "The greater the risk of harm to others, the greater is the fault." Id. at 805. As stated by the Louisiana Supreme Court in Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 406 (La.1978):
The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of care than that required of pedestrians is imposed upon the motorist commensurate with the hazards his conduct inflicts upon the public safety.... It must be noted, however, that a motorist who exercises all reasonable care to protect a pedestrian, who nonetheless suffers injury, is not at fault.
Likewise, a pedestrian is charged with a duty to exercise reasonable care when entering the roadway or a crosswalk. Miller v. Bailey, 621 So.2d 1174 (La.App. 3 Cir.), writ denied, 629 So.2d 358 (La.1993). A pedestrian simply may not freely choose to leave a position of safety and pursue a course certain to enter the path of a vehicle which is so close that it is impossible for the driver to yield. La.R.S. 32:212(B). Furthermore, when a pedestrian crosses a roadway at any point other than within a marked cross walk or within an unmarked cross walk at an intersection, the pedestrian must yield the right of way to all vehicles upon the roadway. La.R.S. 32:213(A). Therefore, responsibility for travel free from undue peril on the streets and highways of this state is shared by both the motorist and pedestrian. The countervailing duties that motorists and pedestrians owe to each other ensure that both pedestrians and motorists may safely coexist on roadways traversed by both.
Although a motorist commands a greater instrumentality of harm, a pedestrian still bears the burden of proving that the motorist was negligent before he can recover damages. Puearry, 496 So.2d at 1374; Bennett v. State, Through DOTD, 503 So.2d 1022 (La.App. 2 Cir.), writ denied, 505 So.2d 58 (La.1987); McKenzie v. NOPSI, 455 So.2d 678 (La.App. 4th Cir.), writ denied, 460 So.2d 1043 (La.1984). A motorist has no special duty to anticipate the presence of a pedestrian in a roadway where there is no crosswalk. Shroyer v. Grush, 555 So.2d 534 (La.App. 4 Cir.1989); writs denied, 559 So.2d 139, 140 (La.1990); Osby v. Harris, 375 So.2d 181 (La.App. 2 Cir.1979). Moreover, a motorist is not held to the highest standard of care in guarding against unexpected or unusual obstructions in the road. Calais v. Thibodeaux, 220 So.2d 209 (La.App. 3 Cir.), writ denied, 254 La. 15, 222 So.2d 67 (1969). A motorist has a right to assume that a pedestrian will remain in a position of safety and will not attempt to enter the path of a moving vehicle. Puearry, 496 So.2d at 1374. However, a motorist may not blindly rely upon this assumption when he sees, should have seen, or anticipates that the pedestrian is going to cross the path of his vehicle. Henry v. Svebek, 339 So.2d 895 (La.App. 3 Cir.1976), writ refused, 341 So.2d 1127 (La. 1977). When a motorist sees, should have seen, or anticipates that the pedestrian is going to cross the path of his vehicle, the motorist must exercise reasonable care to protect the pedestrian. Baumgartner, 356 So.2d at 407.
The appellate jurisdiction of a court of appeal extends to both the law and the facts. La. Const. art. V, § 10(B). However, the exercise of this jurisdiction is tempered by the jurisprudential rule that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed *173 upon review. Stobart v. State, 617 So.2d 880 (La.1993); Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1978). See also Sevier v. USF & G, 497 So.2d 1380, 1383 (La.1986), West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owens, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Prods. Co., 364 So.2d 998, 999 (La.1978); A. Tate, "Manifest Error" Further Observations on Appellate Review of Facts in Louisiana Civil Cases, 22 La.L.Rev. 605, 611 (1962).
Credibility determinations are subject to the strictest deference and the manifest error-clearly wrong standard demands great deference for the trier of fact's findings. Rosell, 549 So.2d at 844-45. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra; Canter, supra. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id.
In the case sub judice, the jury, as trier of fact, was asked to scrutinize the countervailing duties owed between a motorist and a pedestrian and apply them to the facts of this tragic accident. Both the plaintiffs and the defendants assigned competing theories for the cause of this accident and the jury was given the opportunity to weigh the credibility of each side's expert and the testimony of the officers that investigated the accident. In addition, the jury viewed photographs of the decedent and the accident scene, a scale model of the truck and the area where the accident occurred, and heard the live testimony from unbiased witnesses who observed the events that preceded the accident. After thoroughly and carefully reviewing the entire record, we find that the jury could have reasonably reached a verdict in favor of the defendants. Obviously, the jury believed that the defendants' expert presented the most credible version of the accident. Under these circumstances, the jury could have reasonably found that Jerry was entitled to presume that Sylvia would not enter the roadway and chase after his truck with a reckless disregard for her own safety. Any risk to which the decedent was exposed was entirely self-chosen when she left the roadway from a position of safety. See Ehlinger v. Louisiana Dept. Transp. and Dev., 517 So.2d 1136 (La.App. 5 Cir.1987), writ denied, 519 So.2d 129 (La.1988). Accordingly, we cannot say that the jury committed manifest error.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed to the plaintiffs.
AFFIRMED.
COOKS, J., dissents, and assigns reasons.
COOKS, Judge, dissenting.
I respectfully dissent in part. Mr. Uriegas' decision to leave the scene in haste without exercising caution, i.e., keeping a lookout for his obviously distraught and intoxicated ex-wife, constituted negligence; and a percentage of fault, though low, should have been assigned by the jury for this failure.
NOTES
[1] Both parties stipulated that the decedent's blood alcohol level at the time of the accident was .139.
[2] The record indicates that the portion of La. Highway 14 passing Chapel Downs apartment complex is a two lane highway with a west bound and east bound lane.
[3] The defendants stipulated that Jerry was in the course and scope of his employment at the time the accident occurred.
[4] The area where Louisiana Highway 14 and the driveway to the Chapel Downs apartment complex intersect could be described as forming the shape of a "T," with the top of the "T" being Louisiana Highway 14 and the bottom the driveway. Jerry parked his truck somewhere on the top middle to left hand portion of the "T."
[5] Tandem tire tracks are made from the wheels of an 18 wheeler that are mounted side by side, forming one unit.