BELSOME, Judge.
| iThis litigation arises from allegations of medical malpractice against defendant/appellee, Dr. Kenneth Wiley in the treatment of Viola Narcisse. The plaintiffs/appellants are appealing the jury’s verdict in favor of Dr. Wiley.
On May 19, 1997, Viola Narcisse, a 74 year-old female, was admitted to St. Charles General Hospital by Dr. Wiley, an internal medicine physician. At the time she was admitted, Ms. Narcisse had a history of two to three weeks of poor intake, general malaise, weakness, and mild fevers. She was described as a 5'5", 98 pound female, who was alert and oriented.
Upon a neurological examination of Ms. Narcisse, the impression was dehydration, chronic renal insufficiency, malnutrition, hypertension, and recent cerebral vascular accident. On admission, chest x-rays showed a slightly enlarged heart, but was considered negative. Ms. Narcisse was transferred to skilled nursing on May 22, 1997 for continued treatment.
Ms. Narcisse was discharged on July 2, 1997. One day later she was rushed to the emergency room of University Hospital in cardiopulmonary arrest. The |2hospital staff was unable to resuscitate her, and she was pronounced dead. The autopsy report initially attributed her death to “malignancy.” After a request to review those findings, the coroner issued another autopsy report which attributed her death to miliary tuberculosis involving the lungs, pleurae, mediastinal and mesenteric lymph nodes, spleen, liver, fallopian tubes, and hypophysis.
Thereafter, plaintiffs filed a complaint with the Louisiana Patients’ Compensation *1271 Fund, alleging that Dr. Wiley was negligent in his diagnosis and treatment of Ms. Narcisse. The Medical Review Panel determined that Dr. Wiley’s care and treatment of Ms. Narcisse did not breach the standard of care. Subsequently, this lawsuit was filed against Dr. Wiley and a jury trial ensued. Ultimately a 9-3 verdict was returned in favor of Dr. Wiley. The trial court signed a judgment in conformity with the verdict of the jury. The plaintiffs then filed a Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial.
At the hearing on those motions the plaintiffs argued that the jury’s verdict was contrary to the law and evidence and thus a JNOV was appropriate. Alternatively, the plaintiffs’ filed a motion for new trial alleging jury misconduct and that the trial judge had ex parte communication with the jury. After hearing arguments and taking testimony on the issues, the trial court denied the plaintiffs’ motions and this appeal followed.
On appeal the plaintiffs/appellants list several assignments of error on the part of the trial court, 1) the trial court erred in denying appellants’ motion for new | ¡¡trial; 2) the jury erred in finding that Dr. Wiley met the standard of care in Ms. Narcisse’s treatment; 3) the jury erred in not finding that Dr. Wiley’s breach of the standard of care caused and contributed to Ms. Nar-cisse’s death; and 4) the trial court erred in denying appellants’ motion for judgment notwithstanding the verdict.
Appellants’ argument on the first assignment of error asserts that there were two grounds upon which the trial court should have granted their motion for new trial. Specifically, appellants contend that jury misconduct and the trial judge’s ex parte communication with the jury warranted a new trial.
This Court reviews the granting or denial of a motion for new trial under an abuse of discretion standard. Davis v. Wal-Mart Stores, Inc., 00-445 (La.11/28/00), 774 So.2d 84. The granting of a new trial is not justified in every instance of jury misconduct. Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181, 186 (La.App. 4 Cir.1987). The party seeking a new trial on the basis of jury misconduct must show that the conduct has prevented the impartial administration of justice. La. C.C.P. art. 1972(3). Because there is not an expressed definition of improper behavior by a juror or jury, the facts and circumstances of each particular case must be reviewed to determine whether said behavior was improper. West v. National Railroad Passenger Corp., 03-1707, p. 6 (La.App. 4 Cir. 6/23/04), 879 So.2d 327, 332 citing Uriegas v. Gainsco, 94-1400 (La.App 3 Cir. 9/13/95), 663 So.2d 162.
The appellants aver that the jury had access to documents that were not submitted as evidence in the course of the trial. More specifically, they claim that Rat least one juror reviewed documents from attorneys’ files that were left inside of the courtroom during deliberations. Thus, the jury verdict was tainted and a new trial should be granted. At the hearing on the motion for new trial, appellants called the jury foreperson, Raymond Bankston, and juror, John Ellison to testify regarding the documents that were reviewed and the impact it may have had on the jury’s verdict. The witnesses were also present to testify as to any ex parte communication that was had with the trial court judge.
Mr. Bankston testified first, stating that at approximately 6:00 p.m. on the Friday night that the jurors began deliberations he informed the judge “I don’t think it’s going to happen tonight.” He then stated *1272 that the judge discussed the options for further deliberations. The judge explained that the jurors could try to continue on that night, return on Saturday morning or return on Monday morning. Bankston said that he related this information to the other jurors and they decided to stay awhile longer. The jury returned the 9-3 verdict at approximately 7:45 p.m. that Friday evening. Mr. Bank-ston was specifically asked if he felt as though “any juror just sort of threw in a towel or switched their vote just to say, let’s get out of here, it’s getting late?” Mr. Bankston responded: “I honestly do not feel that way.”
Next Mr. Ellison was called to testify. His testimony did not conflict with Mr. Bankston’s testimony concerning their communication with the judge. He further admitted to rummaging through a box of documents that had not been admitted as evidence, but were left in the courtroom. Mr. Ellison was questioned about what, if any, effect the viewing of the materials in the box had on the outcome of the jury’s verdict:
Q. Did you tell anyone what you did or didn’t look at, any of the other jurors?
Is A. No.
Q. Had you already made — did you change your mind after you went through the boxes?
A. No.
Q. Your jury position?
A. No.
He further explained that he was on the “plaintiffs side”, but after reviewing the law as presented in the jury instructions together with the medical panel opinion and the testimony of the defendant’s experts he voted with the defense and that his vote did not change. In sum, he claimed that no one else looked in the box, he did not share any information or documents he viewed and he maintained that it did not influence his decision.
The appellants also alleged that the trial court knew prior to 6:00 p.m. that the jurors were deadlocked and shared that information with appellee’s counsel, Michael Daly. Appellants’ counsel continued to disseminate that allegation even after the judge assured them that there was no truth to it. The unsubstantiated accusation seemed to be based on information that was given to the appellants’ counsel by a paralegal that was not called to testify nor was an affidavit presented on her behalf. Mr. Daly also denied on the record that any ex parte communications regarding the jury being deadlocked occurred between him and the judge. He and the judge both acknowledged that they exchanged “niceties” while appellants’ counsel was out of the building, but any discussion regarding the status of the jury was done in the presence of all counsel.
“When a jury reports that it cannot reach a verdict and is deadlocked, this will often prompt additional instructions by the trial judge.” La. Prac. Civ. Trial § 13:62. La. C.C.P. art. 1796 deals with additional instructions to jurors at their request and in pertinent part states, “[i]f the jury, after retiring for deliberation, desires to receive information on any point of law, they shall be conducted to the courtroom.” (emphasis added.) However, in the case sub judice, the instructions given to the jury by the judge outside of counsel’s presence was not of a legal nature.
The trial court judge and the two jurors who testified confirmed that there was one ex parte communication at 6:00 p.m. regarding the jury being deadlocked. At that time the judge informed the jury of scheduling options for continuing deliberations. Further, Mr. Daly stated on the record that he was not aware of the jury *1273 being deadlocked anytime prior to the judge addressing the issue with all counsel present.
It is surprising that the appellants would submit an argument alleging judicial misconduct on appeal after all the facts obtained at the hearing refuted these allegations. Perhaps some confusion existed prior to the post trial hearing warranting an inquiry. However, once the hearing was conducted it became apparent that these allegations were wholly unsubstantiated.
For the reasons discussed, we find that the appellants failed to produce evidence that there was any behavior of a grievous nature, such to warrant the granting of a new trial. Thus, the appellants have failed to meet their burden to |7establish that the trial court abused its discretion in denying the motion for new trial.
The appellants’ next assignments of error argue that the jury erred in its finding that Dr. Wiley’s diagnosis and treatment of Ms. Narcisse did not fall below the standard of care. More specifically, Dr. Wiley never diagnosed Ms. Nar-cisse’s tuberculosis. Thus, she was never isolated for having the infectious disease nor was she treated for the disease, which caused or contributed to her death.
This Court reviews findings of fact under a manifest error/clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). In determining the correctness of a jury’s finding of fact this Court must determine whether a reasonable factual basis exists for the finding of the trial court and must also find the record establishes that the finding is not clearly wrong. Stobart v. Dept. of Transportation and Development, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991). When there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The medical record and Dr. Wiley’s testimony documented the course of Ms. Nar-cisse’s treatment during her stay at St. Charles General Hospital. She was admitted on May 19, 1997 exhibiting signs of dehydration, chronic renal insufficiency, malnutrition, and hypertension. Dr. Wiley’s differential diagnosis was malignancy or tuberculosis. Through various tests he was unable to make a definitive diagnosis of either condition.
After obtaining a negative result on the PPD skin test for tuberculosis and not receiving positive results from an acid fast bacilli (AFB) test done on the pleural fluids collected during a thoracentisis, Dr. Wiley consulted with LSU pulmonologist, Dr. Dwayne Thomas who recommended a pleural biopsy. There are two types of pleural biopsies, open and closed. The open biopsy procedure requires anesthesia, so that the patient’s chest cavity can be opened. A closed biopsy procedure is done while the patient is awake. The pleural biopsy would have provided tissue to definitively diagnose or rule out tuberculosis. General surgeon, Dr. Michael Ad-inolfi’s notes indicated that Ms. Narcisse could not tolerate the open biopsy procedure. Dr. Thomas wanted to perform the closed pleural biopsy. However, when Dr. Thomas discussed having closed biopsy with Ms. Narcisse she would not consent to that procedure. Ms. Narcisse stated that she wanted to be “put to sleep” for the procedure which is not possible with the closed biopsy. Without a definitive diagnosis of tuberculosis, Dr. Wiley and Dr. Thomas agreed that treating for tuberculosis was not an option. Ms. Narcisse was discharged from the hospital with orders for a home healthcare nurse, directions for medication and diet needs and *1274 a scheduled follow up appointment with Dr. Wiley.
The jury was presented with the expert testimony of several physicians. Radiologist, Dr. Sherman Brown testified regarding the chest x-rays that had been ordered by Dr. Wiley. He stated that the chest x-ray taken upon Ms. Narcisse’s admittance on May 19, 1997 showed her lungs were clear. He further testified that the chest x-ray taken on May 22, 1997 and a CT scan done on May 27, 1997 [¡¡revealed fluid in her lung. On June 13, 1997, Ms. Nar-cisse underwent a thoracentesis to remove the fluid from her lung. The pleural fluid which was removed was used for an AFB smear to be tested for tuberculosis. The result of that smear was negative. Dr. Brown also discussed the findings in the June 17, 1997 x-ray. In that x-ray he stated that the apex of the lung had a lumpy appearance indicative of fibronodu-lar disease. He also claimed that fibrono-dular disease could mean tuberculosis. However, Dr. Brown acknowledged that a pathologist would be the best physician to diagnose tuberculosis and he was aware that the tests performed on the pleural fluids were negative for tuberculosis. He further agreed that a pleural biopsy would have produced the tissue necessary to produce a definitive diagnosis of tuberculosis.
The plaintiffs called Dr. William Grant, an expert in the fields of infectious disease and internal medicine, to testify regarding Dr. Wiley’s care and treatment of Ms. Narcisse. Dr. Grant discussed the Center for Disease Control (CDC) isolation requirements for tuberculosis patients and claimed it was clearly below the standard of care for Ms. Narcisse to not be isolated as soon as there was a suspicion that she may have had tuberculosis. The medical review panel disagreed on that assertion because the record established she was not contagious during her stay at St. Charles General Hospital. He also stated that Dr. Wiley should have followed the CDC guidelines in testing for tuberculosis, which would have been three AFB smears. Although, the other physicians that testified did not dispute the fact that the three AFB smears is a standard way to definitively diagnose tuberculosis, they also acknowledged that sputum samples are needed for thej^smears and Ms. Narcisse was not producing sputum even when induced to through breathing treatments. Dr. Grant further criticized Dr. Wiley’s decision to wait for a definitive diagnosis of tuberculosis before treating for tuberculosis, a diagnosis that was never established because Ms. Narcisse did not consent to have the pleural biopsy. His testimony was that there were enough indicators of tuberculosis to warrant treating imperially. Dr. Thomas unequivocally disputed that position, emphasizing that Ms. Nar-cisse’s age and condition called for a definitive diagnosis of tuberculosis given the risks associated with tuberculosis treatment including liver disease and the possibility of death.
The plaintiffs also asserted arguments addressing the issues of Ms. Narcisse’s treatment for malnutrition and her being released from the hospital without oxygen. Dr. Grant opined that there was not enough done to remedy the malnutrition. He also testified that he believed that the lack of oxygen was a contributing factor in her death.
The fact that Ms. Narcisse suffered from malnutrition was well documented. However, the testimony provided indicated that she was able to eat food by mouth and her diet was being supplemented with a high calorie liquid. Dr. Wiley’s experts testified that they found the measures taken regarding the treatment of Ms. Nar-cisse’s malnutrition were reasonable and did not fall below the standard of care.
*1275 As for the release of the patient without oxygen, Dr. Wiley’s experts discussed the patients’ oxygen saturation during her stay in the hospital and at the time of release. Their opinions were consistent in that they all claimed the use of oxygen during Ms. Narcisse’s stay at the hospital was for comfort and that her saturation levels at the time she was discharged were satisfactory.
f^In sum, the jurors heard the testimony of several physicians other than Dr. Wiley. Dr. Grant opined that Dr. Wiley’s failure to diagnose Ms. Narcisse with tuberculosis and his overall care and treatment of her fell below the standard of care. However, the jurors also heard testimony from Dr. Thomas, one of the many physicians called in as a consultant on Ms. Narcisse’s case. Dr. Thomas’ testimony refuted Dr. Grant’s opinion on how Dr. Wiley should have proceeded in Ms. Nar-cisse’s care and treatment. Dr. Thomas’ opinion was that given the patient’s condition and her unwillingness to consent to the pleural biopsy, Dr. Wiley acted prudently in the decisions he made regarding Ms. Narcisse.
Also called to testify were two of the physicians, Dr. James Tebbe and Dr. Tlaloc Alferez, from the medical review panel that unanimously found Dr. Wiley had not breached the standard of care regarding Ms. Narcisse. Both physicians justified their findings as panel members and did not waver in their opinions at the time of trial.
In reviewing the record of this case to determine the rightness of the jury verdict, the threshold is not whether this Court sitting as the trier of fact would have decided the case differently, but whether the jurors’ findings were manifestly erroneous or clearly wrong. Considering the evidence presented to the jurors we cannot conclude that their findings were manifestly erroneous or clearly wrong. Accordingly, we must affirm the trial court judgment.
AFFIRMED.