842 So.2d 1210 (2003)
Jerrilyn WILLIAMS and Todd Williams, Plaintiff/Appellee,
v.
SUPER TRUCKS, INC., Ford Motor Company, White & Babin Ford Company, Inc., William C. Martin, & Derrell Graham Chevrolet, Inc., Defendants/Appellees.
Glen F. Post, Jr., Plaintiffs/Appellants,
v.
Super Trucks, Inc., Ford Motor Company, White & Babin Ford Company, Inc., William C. Martin, & Derrell Graham Chevrolet, Inc., Defendants/Appellees.
Nos. 36,993-CA, 36,994-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
*1213 Dollar Laird, L.L.P., by Johnny E. Dollar, Monroe, for Appellants.
David F. Post, Farmerville, for Appellee, Glen F. Post, Jr.
McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, P.C., by Robert W. Maxwell, Keith W. McDaniel, Lance B. Williams, Metairie, for Appellee, Ford Motor Company.
Stanley Kendrick Hurder, Baton Rouge, for Intervenor/ Appellee, Louisiana State Employees Group Benefits Plan.
Before WILLIAMS, PEATROSS & MOORE, JJ.
PEATROSS, J.
This appeal arises from a jury verdict in favor of the defendant, Ford Motor Company, *1214 finding that Ford was not liable to plaintiffs, Jerrilyn Williams and Todd Williams, individually and as natural tutrix and tutor, respectively, of the minor Jeremy Williams, and Glen Post, Jr. (collectively "Plaintiffs"), and dismissing Plaintiffs' claims against Ford with prejudice. Plaintiffs now appeal the judgment of the trial court. For the reasons stated herein, we affirm.

FACTS
On November 24, 1990, Mr. Glen Post, Jr. was driving his 1977 Ford Bronco ("Bronco") north on Louisiana Highway 549 near Famerville, Union Parish, Louisiana, when his vehicle collided with a Chevrolet Camaro driven by Mrs. Jerrilyn Williams who was headed south on the same highway. It was determined that suddenly, and without warning, the left rear axle on the Bronco snapped completely in two, causing the left rear wheel and part of the axle to break free from the vehicle. The loss of the wheel caused the Bronco to cross over the center line and collide with the Camaro driven by Mrs. Williams. Mrs. Williams and her son, Jeremy Williams, who was also in the car, were both injured. Mrs. Williams sustained several serious injuries, including disfigurement, lacerations, multiple fractures, contusions, abrasions and a crushed knee and ankle. Jeremy sustained lacerations, contusions and embedded glass in his head. Mr. Post was also injured, sustaining several serious injuries, including contusions, abrasions and a fracture to his right femur. The Bronco was a total loss. Neither Mr. Post nor Mrs. Williams were determined to be at fault in the accident.
The trial judge found that the reason the axle on the Bronco snapped in two was because of negligent repair work done to the vehicle at Super Trucks, Inc. in West Monroe. A cutting torch, applying extreme heat, was used to replace the bearings on the rear of the vehicle and the use of the torch weakened the axle of the vehicle, causing it to fail and the wheel to fall off the vehicle while it was in motion. On July 16, 1991, Mr. and Mrs. Williams, both individually and on behalf of their son Jeremy, filed suit against, among others, Super Trucks, Inc. ("Super Trucks") and Ford Motor Company ("Ford"). On July 25, 1991, Mr. Post filed suit against these same Defendants. Plaintiffs alleged that Ford was responsible for design defects in the Bronco, inadequate warnings and other acts of fault and negligence.[1] In particular, Plaintiffs argued that the warning in the 1977 Ford shop manual was inadequate. The warning stated:
If the wheel bearing is to be replaced, the inner retainer ring must first be loosened. Never apply heat to do this. (Emphasis added.)
In addition, Plaintiffs alleged, inter alia, that Super Trucks was responsible for failing to use proper repair procedures on the vehicle. In 1998, the trial court consolidated the two lawsuits.
On April 30, 2001, trial commenced. At trial, the records from Super Trucks showed that Matt Prophit, a mechanic, made repairs to the Bronco on July 26, 1990, replacing both wheel bearings at the rear of the vehicle by using a cutting torch, applying heat to the axle. In his deposition,[2] Mr. Prophit stated that there were two ways to remove old wheel bearings, either with a cutting torch or a press. He was only trained in the method of *1215 removing wheel bearings with a cutting torch. He stated that he had not read the shop manual which contained the warning not to apply heat and that no one ever told him not to use a cutting torch. Lionel Reed, however, owner of Super Trucks, disputed Mr. Prophit's statements and testified at trial that he required his mechanics to use a press to remove wheel bearings and not to use a cutting torch.
Dr. Paul Packman testified at trial for Plaintiffs and he was tendered and accepted as an expert in the fields of metallurgical design, failure analysis and warnings. He worked extensively for the steel companies that produce the steel used in axles like the axle used on the Bronco. Dr. Packman testified that, had there been a warning on the axle itself, in all likelihood heat would not have been applied to it during repair. He was certain that, if the heat had not been applied by the cutting torch to the axle, the accident would not have occurred. Dr. Packman testified that the axle failure was caused through a chain reaction of events. First, when the bearing was removed, heat was applied to remove the bearing unevenly with attempts to cut through the bearing. The heating process changed the metallurgical structure of the steel in the axle causing "auto-quenching."[3] When the axle is properly manufactured, it has a tough outer edge; but with heat applied, the structural integrity is destroyed. Dr. Packman testified that, once the axle becomes cracked, it is unreasonably dangerous with no failsafe mechanism.
Dr. Packman concluded that the heat required to change the metallurgical structure came from a cutting torch. With the axle having a crack caused by heating, the fatigue crack grew across the surface leading to the ultimate failure and the loss of a wheel in an accident. Dr. Packman testified that Ford was aware that the torch-cutting technique was commonly used; that it would create an unreasonably dangerous situation; and the instruction to not apply heat to the axle in Ford's shop manual was not really a warning at all. He suggested that a warning to not apply heat should have been placed on the axle; however, he admitted that he made no study of how such a warning would hold up to the corrosion experienced by the axles in everyday use and he acknowledged that an inscribed warning on the axle could induce failure in the axle. Dr. Packman also acknowledged that he had no way of telling whether an etching on the axle could actually survive Ford's manufacturing process.
James Varin testified on behalf of Ford and was accepted by the trial court as an expert in the areas of automotive engineering and metallurgical failure analysis. He stated that he had worked with, and for Ford, for many years and had previously been a supervisor of design and light truck braking, steering and suspension design activity. He was also a principal design engineer for design development and testing of axle assembly. He noted that more than 200 million similar axles were manufactured by Ford. Mr. Varin testified that the physical evidence submitted showed that heat had been applied to the axle on the Bronco during repair. He further testified that failure of the axle was caused by the heating during repair. Other than the warning given in the shop manuals to not apply heat to the axle, he was unaware of an appropriate manner to *1216 actually affix a warning to the axle itself because it was not likely to remain visible due to the grease, corrosion and exposure to the environment, which was common to this moving part. In his opinion, the method of raised lettering on the axle would even induce failure in the axle and cause it to fracture.
Dr. Alan Dorris also testified at trial for Ford as a human factors engineer and in regard to warnings. In his opinion, it was not appropriate to place all warnings on the product itself. He stated that, regarding the dangers associated with repair of the bearing, not only heating, but also hammering, drilling and grinding could cause damage to the axle and that there were potentially 35 other hazards associated with bearing repair, which could not all be warned of on the axle itself. He explained that, in light of the numerous hazards associated with automotive repair, the shop manual is the appropriate place to put any warnings related to the repair of vehicle products such as the axle. Finally, Dr. Dorris noted that the language in the shop manual was sufficient here and he considered Ford's language of not applying heat to the axle to be a sufficient warning.
Dr. John Tabony, Jr. also testified at trial for Ford. Dr. Tabony was accepted as an expert in mechanical engineering and metallurgy. He determined that the axle on the Bronco failed due to a fatigue crack on the axle. According to Dr. Tabony, the contributing factors to the fatigue failure were from heat having been applied in the wheel bearing area and the improper removal of the wheel bearing. Dr. Tabony testified that an improper removal of the wheel bearing was the reason the axle failed and fatigued. He confirmed that, once heat was applied with the temperature of the cutting torch, the axle would be unsafe. Dr. Tabony further testified that a warning on the axle in chemical etching was probably not practical because, over a period of time, a person would no longer be able to see it. Finally, he explained that applying raised letters on the axle itself would cause a vibration problem on the axle, which would introduce "stress risers," promoting a fatigue failure in the axle.
The jury rendered a verdict on May 5, 2001, finding Super Trucks to be 75 percent at fault in the accident; Mr. Profit to be 12 and one-half percent at fault; and Leon Cook, another mechanic who had replaced other wheel bearings on the Bronco on October 25, 1990, to be 12 and one-half percent at fault. The jury awarded damages to Jerrilyn Williams in the amount of $100,000, which included $25,000 for medical expenses, $25,000 for disability and loss of function and $50,000 for disfigurement. The jury further awarded damages to Todd Williams in the amount of $5,000 for loss of consortium; damages to Jeremy Williams in the amount of $1,000 for medical expenses and $1,000 for loss of consortium; and medical damages in the amount of $5,000 to Glen Post, Jr. The jury found that Ford Motor Company was not at fault in this accident. The trial judge rendered judgment in accord with the jury's verdict.
The Plaintiffs subsequently filed a motion for judgment notwithstanding the verdict, or alternatively, a motion for new trial. In their motion for judgment notwithstanding the verdict, Plaintiffs sought to set aside the verdict of the jury on the issues of damages in general and specifically as to Ford's lack of liability. In their motion for new trial, the Plaintiffs claimed that there was jury misconduct and they sought to set aside the jury verdict on the ground that the misconduct was of such a grievous nature that it precluded the impartial administration of justice. The trial judge denied the Plaintiffs' motion for *1217 judgment notwithstanding the verdict as to the liability of Ford, finding that whether a particular warning is adequate is a question for the trier of fact to decide and he would not substitute his judgment for the judgment of the jury. The trial judge did, however, grant the motion notwithstanding the verdict on the issue of damages, finding that the award of damages was "totally unreasonable," and noting that the injuries to each of the plaintiffs were severe and could affect them over each of their lifetimes. The damage awards were increased and damages were awarded to Jerrilyn Williams in the amount of $872,000; damages to Todd Williams in the amount of $37,897; and damages to Glen Post, Jr. in the amount of $540,000.
The trial judge also addressed the motion for new trial, noting that the party seeking a new trial must prove that the level of juror misconduct was of such a grievous nature as to preclude the impartial administration of justice. The trial judge permitted Plaintiffs to depose the jurors, before holding the motion for new trial hearing, in order to determine if there was any improper influence on the jury. Plaintiffs produced evidence that they characterized as juror misconduct, arguing that the jury verdict was clearly contrary to the law and evidence and that the jury behaved improperly. Plaintiffs asserted that the jury based its decisions on bias not revealed during voir dire and that they did not follow the court's instructions. This, they argued, was a patent miscarriage of justice.
Plaintiffs took affidavits of three jurors, seeking to have them admitted at the hearing on the motion for a new trial. The jurors were not allowed to testify at this hearing. Plaintiffs contended that the depositions of Jurors Parker, Jones and Hunt indicate that, during deliberations, a couple of the jurors discussed how they did not believe in lawsuits and how Mr. Post in particular was independently wealthy and did not need the money. According to Plaintiffs, this bias could have weighed heavily on the other jurors and the trial judge should have an evidentiary hearing to determine if there was juror misconduct. Although the trial judge was troubled by what he called the "woefully inadequate award of quantum" to Plaintiffs, he held that the evidence presented at the motion for new trial hearing was insufficient to grant a new trial. This appeal ensued. On appeal, Plaintiffs raise the following assignments of error:
1. The trial court erred in not ordering a new trial on peremptory and discretionary grounds.
2. The jury erred in finding Ford Motor Company free from fault by its finding that there was an adequate warning.

DISCUSSION

Adequate Warning
In their second assignment of error, Plaintiffs argue that the jury was clearly wrong in its finding that Ford provided an adequate warning on the Bronco. They assert that the warning in the 1977 Ford shop manual which states, "Never apply heat," to the axle on the Bronco when replacing wheel bearings, is inadequate and that Ford should be liable for producing an unreasonably dangerous product. In addition, Plaintiffs argue that Ford should have put a warning on the axle itself. They further contend that Ford knew the danger of heat being applied to the axle; it could have warned of the danger; it chose not to do so; and the jury should have found Ford liable. We do not agree.
Whether a particular warning on a product is adequate is a question for the *1218 trier of fact. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). A jury's finding of fact may not be reversed on appeal absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must, instead, review the record in its entirety to determine whether the jury's finding was clearly wrong or manifestly erroneous. Stobart, supra. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. The reviewing court must always keep in mind that, "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." [Stobart, supra, citing Housley v. Cerise, 579 So.2d 973 (La.1991)(quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La. 1990)) ].
The claims made against Ford in the case sub judice are governed by the Louisiana Product Liability Act ("LPLA"), La. R.S. 9:2800.51, et seq. In particular, under La. R.S. 9:2800.54(A), in order for Ford to be held liable to Plaintiffs, Plaintiffs must show that the damage to them was "proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product" by them or another person or entity. Plaintiffs argue that the axle on the Bronco was unreasonably dangerous because there was not an adequate warning on the axle itself informing all who repaired it not to apply heat to it. Whether or not a product is unreasonably dangerous because of an inadequate warning is determined under La. R.S. 9:2800.57, which sets forth that:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacture of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
Under La. R.S. 9:2800.53(9), an adequate warning on a product is defined as:

*1219 A warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.
The determination of whether a warning is adequate depends upon a balancing of considerations including, among other factors, the severity of the danger, the likelihood that the warning will catch the attention of those who will forseeably use the product and convey the nature of the danger to them, the intensity and the form of the warning and the cost of improving the strength or mode of the warning. Bloxom, supra.
The evidence presented at trial, in the case sub judice, shows that the Ford service manual, as well as other general shop manuals, warned against the use of heat on the axle on the Bronco. These manuals are commonly used by those who repair vehicles and the warning is designed to inform all not to apply heat to the axle. The jury listened to the evidence presented by both Plaintiffs and Ford and found this warning to be adequate. After reviewing the record in its entirety, we hold that the jury's finding is reasonable and supported by the evidence.[4]
Plaintiffs' argument that Ford should have included a warning on the axle itself, by the method of raised or stamped lettering, is not persuasive. The expert testimony at trial indicated that, if such a warning was placed on the axle itself, it could weaken the axle and cause premature axle failure. Plaintiffs produced no evidence at trial that such a warning had ever been used on a rear semi-float axle, such as the one involved in the present case. Ford demonstrated at trial that its axle plant had produced more than 200 million semi-float axles, all without warnings on the axle. The Plaintiffs produced no evidence to show that axles were failing regularly because they were being improperly repaired. The jury discovered through the testimony at trial that almost any labeling or manufacturing warning marks would not survive the manufacturing process, nor would they survive the post manufacturing environment.
Plaintiffs cite several cases in an attempt to argue that the jury should have found that Ford did not provide an adequate warning on the Bronco.[5] These *1220 cases are dissimilar to the facts in the case sub judice; and, thus, they are not persuasive. Although juries in other cases have found the need to place a warning on a product itself, the jury in the instant case applied the law to the facts and determined that the warning in the shop manual was adequate and the most proper place to put the warning. The jury finding here, that the Bronco was not unreasonably dangerous because Ford had provided an adequate warning, is reasonable based on the evidence and we will not disturb that finding. This assignment of error is without merit.

Motion for New Trial
Plaintiffs argue that the trial court should have granted them a new trial based on alleged juror misconduct. Plaintiffs assert that the jury behaved improperly and the jury verdict was contrary to the law and evidence. Using depositions of three specific jurors, Plaintiffs contend that a new trial should have been granted because of a patent miscarriage of justice due to the jury's failure to follow instructions and also by basing its verdict on bias against lawsuits. We are not persuaded by Plaintiffs' arguments.
La. C.C.P. art.1973 provides that "[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law." La. C.C.P. art.1972(3) provides that "[a] new trial shall be granted, upon contradictory motion of any party when the jury ... has behaved improperly so that impartial justice has not been done." Improper behavior by a jury is not defined, but must be determined by the facts and circumstances of the particular case. Blandino v. Brown Erection Co., Inc., 341 So.2d 577 (La.App. 2d Cir.1977).
A new trial is mandated only upon a showing of jury misconduct which is of such a grievous nature as to preclude the impartial administration of justice. Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1122 (La.1984). Otherwise, the granting of a new trial is left to the sound discretion of the trial court. Id. A decision to deny a motion for new trial based upon jury misconduct is reviewed pursuant to an abuse of discretion standard. Wright v. Hirsch, 560 So.2d 835 (La.1990). When reviewing the denial of a motion for new trial, unless an abuse of discretion can be exhibited, the trial court's decision will not be reversed. Davis v. Coregis Ins. Co., 00-00475 (La. App. 3d Cir.12/27/00), 789 So.2d 7, writ denied, 01-0292 (La.3/30/01), 788 So.2d 1192.
Not every instance of jury misconduct necessitates the granting of a *1221 new trial. Gormley v. Grand Lodge of the State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.1987), writ denied, 506 So.2d 1227 (La.1987). The burden falls upon the one who is moving for a mistrial to prove that the level of the behavior was of such a grievous nature as to preclude the impartial administration of justice. Brown v. Hudson, 96-2087 (La.App. 1st Cir.9/19/97), 700 So.2d 932, cert. denied, 524 U.S. 916, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998). This is a heavy burden on the mover. The courts of this state have been reluctant to set aside jury verdicts based upon allegations of improper behavior. Brown, supra. The presence of expressive or highly opinionated persons on a jury has been held not to constitute improper behavior. Stockstill v. C.F. Industries, Inc., 94-2072 (La.App. 1st Cir.12/15/95), 665 So.2d 802, writ denied, 96-0149 (La.3/15/96), 669 So.2d 428; Theriot v. Theriot, 622 So.2d 257 (La.App. 1st Cir.1993), writ denied, 629 So.2d 1138 (La.1993). Moreover, discussions during deliberation of independent research conducted by a juror has also been held to be insufficient grounds for setting aside a jury verdict. Wright, supra; Smith v. Bundrick, 27,552 (La. App.2d Cir.11/3/95), 663 So.2d 554.
In addition, the sanctity of jury deliberations must be respected. It is well settled that affidavits and other testimony by jurors cannot be used as evidence to impeach their verdict. Uriegas v. Gainsco, 94-1400 (La.App. 3d Cir.9/13/95), 663 So.2d 162, writ denied, 95-2485 (La.12/15/95), 664 So.2d 458. La. C.E. art. 606(B) provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (Emphasis added.)
The purpose of the first part of this rule is to protect and seclude from public disclosure how and why a jury reaches a verdict. Acosta v. Pendleton Memorial Methodist Hospital, 545 So.2d 1053 (La.App. 4th Cir. 1989), writs denied, 551 So.2d 637, 638 (La.1989). The rule prohibits any publication of the juror arguments, statements, discussions, mental and emotional reactions, mental processes, preliminary votes and explanations, clarifications or statements which form the reason or comprehension of the verdict. Id. In summary, the rule prevents any inquiry into the internal deliberations of the jury. Id.
Furthermore, invasive scrutiny of a juror's individual deliberation or investigation of a jury's collective reasoning for reaching a verdict are disfavored in the law as a matter of public policy. Uriegas, supra. The reason for this rule is to promote the jury's discovery of the truth by preventing litigants from invading the privacy of the jury room. Ryals v. Home Ins. Co., 410 So.2d 827 (La.App. 3d Cir. 1982), writs denied, 414 So.2d 375, 376 (La.1982). "One reason for this rule is that if, after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would invite tampering with jurors and would place it in the power of a *1222 dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under the sanction of oath." Parker v. Centenary Heritage Manor Nursing Home, 28,401 (La.App.2d Cir.6/26/96), 677 So.2d 568, writ denied, 96-1960 (La.11/1/96), 681 So.2d 1271.
In the case sub judice, Plaintiffs propose that we use the depositions of three jurors to impeach the verdict of the entire jury. This we will not do. The record reflects that the trial judge provided a hearing to Plaintiffs to present their motion for a new trial and found that the evidence of improper jury behavior was not sufficient to warrant a new trial. The trial judge properly excluded the testimony of the three jurors concerning their deliberations and he did not abuse his discretion when he denied Plaintiffs' motion for a new trial. The evidence of strong opinions from one or two jurors about lawsuits is not enough to show that the jury behaved so improperly that Plaintiffs were prevented from receiving impartial justice. Under the facts and circumstances presented by record before us, we do not find that the jury behaved so improperly as to prevent impartial justice from being done. This assignment of error is without merit. 
CONCLUSION
For the foregoing reasons, the judgment of the trial court following the jury verdict in favor of Ford Motor Company, finding that Ford was not liable to Plaintiffs, Jerrilyn Williams and Todd Williams, individually and as natural tutrix and tutor, respectively, of the minor Jeremy Williams, and Glen Post, Jr., is affirmed. Costs of this appeal are assessed to Plaintiffs, Jerrilyn Williams and Todd Williams, individually and as natural tutrix and tutor, respectively, of the minor Jeremy Williams, and Glen Post, Jr.
AFFIRMED.
NOTES
[1] Plaintiffs later waived the design defect claim.
[2] Since Mr. Prophit was living out of state and unavailable for trial, he testified by deposition.
[3] Auto-quenching is where the metallurgical structure of the surface of the axle becomes different from a normal axle, permitting rapid crack initiation. With the axle having a crack caused by heating, the fatigue crack grows across the surface of the axle leading to the ultimate failure of the axle.
[4] The plain language of the LPLA shows that a plaintiff, asserting a products liability action against a manufacturer, faces a two-tiered burden: the plaintiff must show that (1) his damages were proximately caused by a characteristic of the product that renders it unreasonably dangerous and (2) his damages arose from a reasonably anticipated use of the product. Kampen v. American Isuzu Motors, Inc., 157 F.3d 306 (5th Cir.1998) (en banc); Johnson v. Black & Decker U.S., Inc., 29,996 (La. App.2d Cir.10/31/97), 701 So.2d 1360, writ denied, 97-2971 (La.2/6/98), 709 So.2d 741. In the instant case, the first jury interrogatory asked the jury if it found by a preponderance of the evidence that the Bronco was unreasonably dangerous because an adequate warning had not been provided. Since the jury answered this question in the negative, however, the jury did not have to answer the second interrogatory which asked that, if an unreasonably dangerous condition did exist at the time the Bronco left the control of Ford, whether the jury also found by a preponderance of the evidence that the unreasonably dangerous condition arose from its reasonably anticipated use. In addition, since the first jury interrogatory was answered in the negative, the jury did not have to answer the third jury interrogatory which asked that, if an unreasonably dangerous condition did exist, whether it was the proximate cause of the injuries to Plaintiffs. Since we hold that the jury's finding is reasonable, it is unnecessary to discuss the second or third jury interrogatories here.
[5] See e.g., Ballam v. Seibels Bruce Ins. Co., 97-1444 (La.App. 4th Cir.4/1/98), 712 So.2d 543, writ denied, 98 1168 (La.6/19/98), 720 So.2d 1213; Black v. Gorman-Rupp, 94-1494 (La.App. 4th Cir.5/16/95), 655 So.2d 717; Moore v. Chrysler Corporation, 596 So.2d 225 (La.App. 2d Cir.1992), writs denied, 599 So.2d 316, 317 (La.1992); Brodtmann v. Duke, 96-0257 (La.App. 4th Cir.2/11/98), 708 So.2d 447, cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); Cannon v. Cavalier Corporation, 572 So.2d 299 (La.App. 2d Cir.1990); Gines v. State Farm Fire and Casualty Co., 516 So.2d 1231 (La.App. 2d Cir. 1987), writ denied, 519 So.2d 127 (La.1988); Clark v. Jesuit High School of New Orleans, 572 So.2d 830 (La.App. 4th Cir.1990), writ denied, 576 So.2d 48 (La.1991); Hooker v. Super Products Corporation, 98-1107 (La.App. 5th Cir.6/30/99), 751 So.2d 889, writs denied, 99-2911, 99-2947 (La.12/17/99), 751 So.2d 880, 884; Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, writs denied, 97-2921, 97-3000 (La.2/6/98), 709 So.2d 735, 744; Lacrouts v. Future Abrasives, Inc., 99-583 (La.App. 5th Cir.11/10/99), 750 So.2d 1063, writ denied, 99-3484 (La.2/11/00), 754 So.2d 941; Simon v. American Crescent Elevator Co., 99-2058 (La.App. 4th Cir.4/26/00), 767 So.2d 64, writ denied, 00-1974 (La.11/13/00), 773 So.2d 726.