# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 08-355 consolidated with CA 08-356, CA 08-357, CA 08-358


**WALTER A. GLOD, JR., M.D.**

**VERSUS**

**W. GREGORY BAKER, ET AL.**


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 97-5864 C/W 98-0481 C/W 98-0482
C/W 98-0483
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and Billy Howard Ezell, Judges.


**AFFIRMED.**

**Steven Gerald Durio**
**Robert Louis Broussard**
**Jessica Farmer Watts**
**Durio, McGoffin, & Stagg**
**P. O. Box 51308**
**Lafayette, LA 70505-1305**
**(337) 233-0300**
**Counsel for Defendants/Appellees:**
**Donald J. Baker**
**Kirby Pecot**
**Andrew B. Jameson**
**Max Luttgeharm**
**M.L. Godley, M.D.**

**Joseph C. Giglio, Jr.**
**Liskow & Lewis**
**P. O. Box 52008**
**Lafayette, LA 70505-2008**
**(337) 232-7424**
**Counsel for Plaintiff/Appellee:**
**Walter A. Glod, Jr., M.D.**

**Robert A. Kutcher**
**Nicole Sophia Tygier**
**Chopin, Wagar, Cole, Richard, Reboul & Kutcher**
**3850 North Causeway Blvd., #900**
**Metairie, LA 70002**
**(504) 830-3824**
**Counsel for Defendant/Appellant:**
**Copeland's of New Orleans, Inc.**

**William H. Parker, III**
**Allen & Gooch**
**P. O. Drawer 3768**
**Lafayette, LA 70502-3768**
**(337) 291-1270**
**Counsel for Defendants/Appellees:**
**Darnell, Sikes, Kolder, Frederick &Rainey**
**BCM, L.L.C.**
**Nawlins Kajun Food, L.L.C.**
**Ed Larry Sikes**

**Larry Lane Roy**
**Jennifer A. Wells**
**Dawn L. Morris**
**Preis & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**Counsel for Defendants/Appellees:**
**Coregis Insurance Company**
**Chris Verret**

**Louis Benedict Viviano**
**Attorney at Law**
**1310 South Union Street, Suite 8**
**Opelousas, LA 70570**
**(337) 948-3044**
**Counsel for Defendant/Appellee:**
**Louis B. Viviano**

**George Allen Walsh**
**Alice F. Estill**
**Attorneys at Law**
**601 Napoleon Street**
**Baton Rouge, LA 70802**
**(225) 381-9305**
**Counsel for Defendants/Appellees:**
**Vikki Lynn Baiers**
**W. Gregory Baker**

**EZELL, JUDGE.**

This case, which has been before this court on numerous occasions, arises out of the termination of the Copeland's of New Orleans (CNO) franchises in Lafayette, Louisiana, and Orlando, Florida. The issues of detrimental reliance and conversion against CNO, Al Copeland, and William Copeland were tried to a jury on December 4, 2006 to December 12, 2006. At the time of trial, the only remaining plaintiffs in the suit were BCM, LLC and Nawlins Kajun Foods, LLC. These entities were the franchisees. The jury rejected their claims for detrimental reliance but found that CNO had converted the property of both BCM and Nawlins. It made an award of $123,189 to BCM and $119,830 to Nawlins on the conversion claims. The jury's decision on both issues is appealed by the parties.

## FACTS

The underlying facts of this case were previously before this court in *Glod v. Baker*, 02-988 (La.App. 3 Cir. 8/6/03), 851 So.2d 1255, *writ denied*, 03-2482 (La. 11/26/03), 860 So.2d 1135. The facts are undisputed by the parties and are restated below:

> In 1994, Alvin C. Copeland, William A. Copeland, and Copeland's of New Orleans, Inc. (the Copelands) entered into a written franchise agreement with W. Gregory Baker (Baker), of Rapides Parish, to open a Copeland's restaurant in Lafayette. Baker initially assigned the franchise to BCM, Inc., a corporation in which he and Vikki Lynn Baiers (Baiers) were the sole stockholders. This assignment had written CNO approval, a requirement under the franchise agreement. Baker and Baiers then hired an accountant, Ed Larry Sikes, and an attorney, Chris A. Verret, both of Lafayette Parish, to work with the franchise. In November 1994, on the advice of their accountant and their attorney, Baker and Baiers created a Louisiana limited liability company, BCM, into which the franchise was transferred. This transfer also had the written approval of CNO.
>
> To get the Lafayette restaurant up and running, BCM needed investors. Baker approached Louis Viviano, of St. Landry Parish, who bought a 30% interest in BCM for $200,000. Viviano then transferred that interest to a wholly owned corporation, LAF Foods, Inc. (LAF),

1

which he had created for the purpose of holding that franchise interest. Baker also obtained from Dr. Walter A. Glod, M.D., of Lafayette Parish, an investment of $100,000 in exchange for a 15% interest. At this point, the ownership of the limited liability company, BCM, was 30% in LAF Foods, Inc., 27.5% in Baker, 27.5% in Baiers, and 15% in Glod. The Copeland's restaurant in Lafayette was built and it opened for business in September 1995.

On January 1, 1996, Baker transferred his interest in BCM into a wholly owned new corporation, Greg Baker Enterprises (GBE), and Baiers transferred her interest into her newly created corporation, VLB, Inc. (VLB). In addition, Viviano transferred his interest held by LAF to CBC International, Inc. (CBC), a sub-chapter S corporation wholly owned by him. As a result of these transfers, the ownership of the limited liability company that held the Lafayette franchise was: GBE, 27.5%; VLB, 27.5%; CBC, 30%; and Glod, 15%.

The Lafayette franchise was a success. Attention was then turned to opening another restaurant, this one in Orlando. For this purpose another limited liability company, Nawlins, had already been created. On or about January 5, 1996, Viviano's sub-chapter S corporation, CBC, invested $75,000 and acquired a one-third interest in Nawlins. Baker and Baiers were the members of Nawlins having the remaining two-thirds interest. They each transferred their respective interests to their corporations, GBE and VLB.

Baker and Baiers created NKF I-Drive Limited Partnership (I-Drive), a Florida limited partnership, to be the operating entity for the Orlando store. A Louisiana corporation, NKF, Inc. (NKF), owned in equal shares by Viviano, Baker and Baiers, was created to be I-Drive's general partner. NKF owned 10% of I-Drive. There were two classes of partners in I-Drive. Class B partners consisted of Nawlins and CPCI, Incorporated (CPCI), another entity owned by Viviano. Class A partners consisted of the individuals Donald Baker, Dr. Lloyd Godley, Max Luttgenharm, Donald Jameson and Kirby Pecot: these individuals were the limited partners, whose investments also contributed to the efforts on behalf of the Orlando store.

Viviano's entity, CBC, loaned $450,000 for the purchase of furniture, fixtures, and equipment for the Orlando store. To secure this loan, CBC got a mortgage on the purchases, and it also required, as collateral, stock pledges from Baker and Baiers. Baker pledged his stock in GBE, and Baiers pledged a thousand shares of her stock in VLB.

Nawlins acquired a franchise from CNO and the Orlando restaurant opened for business. This store was not a success. When it needed money, Viviano, through his entities CBC and CPCI, eventually infused $1,050,000 into the Orlando store. There were loans made by CBC that were later subsumed by loans made by CPCI. As a part of the

2

complicated recapitalization and restructuring process that these loans entailed, Baker sold to Viviano all of his stock in GBE for $225,000. It was through GBE that Baker held his ownership in the LLCs. Baker also acquired half of Baiers' interest in VLB. Later, most of the shares of VLB were purchased by CPCI at a judicial sale. The money changing hands in this process went to I-Drive, but it was all for the benefit of Nawlins.

All of these financial transactions and structuring resulted in numerous conveyancing and encumbrancing of interests in the franchises owned by the LLCs. Eventually, Viviano had the majority ownership or control of both BCM and Nawlins, the two franchisee LLCs. His ownership or control became 85% of BCM and 87.5% of Nawlins.

We have named the corporations, partnerships, and LLCs involved in these multiple and complicated transactions. The individuals involved were Glod, Gregory Baker, Baiers, the two Copelands, Viviano, the five limited partners (Donald Baker, Godley, Luttgenharm, Jameson, and Pecot), Ed Larry Sikes, the accountant, and Chris A. Verret, the attorney.

The franchise agreements contained language prohibiting the conveyance or encumbrance of any interest in the agreement, the restaurant, or the franchisee without the prior written consent of the franchisor. In 1997, learning of these transfers and encumbrancing of interests, and knowing that its consent was last obtained nearly three years earlier in 1994, when the Lafayette franchise was conveyed to BCM, the Copelands instituted arbitration proceedings seeking termination of both franchise agreements. An arbitration award terminated the franchise agreements on September 30, 1997.

In a published opinion in a writ application in one of these consolidated cases, *Glod v. Baker*, 99-0872 (La.App. 3 Cir. 12/8/99), 755 So.2d 910, we agreed with the trial judge that the effect of the arbitration award was to terminate the franchise agreements; it did not affect the pending claims that had been judicially asserted by various parties seeking the return of their investments and lost profits connected to the Copeland's restaurants in Lafayette and Orlando. Those pending claims, described below, proceeded on through discovery toward trial.

*Id.* at 1259-60.

BCM and Nawlins filed suit claiming that they relied to their detriment on the actions/inactions of CNO in investing significant amounts of money to open the two restaurants, in addition to investing more funds to continue operating them. They also claimed that CNO had used and taken property without their consent when it

3

continued to operate the restaurants after the franchises had been terminated. Trial in the present matter proceeded before a jury on December 4, 2006 to December 12, 2006. By this time the only remaining parties were BCM and Nawlins as the franchisees/plaintiffs and CNO, Al Copeland, and William Copeland as defendants.[1] The jury heard evidence regarding the claims of detrimental reliance and conversion. The jury found that CNO had converted the property of BCM and awarded it damages in the amount of $123,189. The jury also found that CNO converted the property of Nawlins and awarded it damages in the amount of $119,830. The jury determined that BCM and Nawlins were not entitled to recover under a theory of detrimental reliance. CNO, BCM, and Nawlins appealed the judgment.

## JURY CHARGES

Both sides complain about charges made to the jury which they argue were legally incorrect and, thus, misleading to the jury, which resulted in a defective verdict. BCM and Nawlins complain about the jury charge regarding detrimental reliance, and CNO complains about the jury charge regarding conversion.

The supreme court recently discussed the law and principles applicable in instructing a jury on the law and the appellate's court responsibility when reviewing those instructions in *Adams v. Rhodia, Inc.*, 07-2110, pp. 5-8 (La. 5/21/08), 983 So.2d 798, 804-05, as follows:

> Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate. *Baxter v. Sonat Offshore Drilling Inc.*, 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906.

---

[1]The remaining claims against Gregory Baker and Vikki Baiers were dismissed by the trial judge on a directed verdict.

Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. *Doyle v. Picadilly Cafeterias*, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).

Correlative to the judge's duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law. *Melancon v. Sunshine Construction, Inc.*, 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016; *Doyle*, 576 So.2d at 1152.

Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.

However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Nicholas v. Allstate Insurance Company*, 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023; *see also Brown v. White*, 405 So.2d 555, 560 (La.App. 4 Cir.1981), *rev'd on other grounds on reh'g*, 430 So.2d 16 (La.1983) (the question is whether the jury was misled to the extent that it was prevented from doing justice) and *Jones v. Liberty Mutual Insurance Company*, 568 So.2d 1091, 1094 (La.App. 5 Cir.1990), *writ denied*, 572 So.2d 72 (1991) (reversible error occurs when the jury is misled to such an extent as to prevent it from doing justice).

Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as

5

a whole and the circumstances of the case. *See Belle Pass Terminal, Inc. v. Jolin, Inc.*, 634 So.2d 466 (La.App. 1 Cir.), *writs denied*, 638 So.2d 1094 (La.1994). Because the adequacy of jury instruction must be determined in the light of jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial *de novo*, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. *Brown*, 405 So.2d at 558.

Jury Charge on Detrimental Reliance

During deliberations, the jury sent a note to the judge informing him that it was having a small problem with the definition of detrimental reliance. After discussing the matter with counsel, the judge read a supplemental instruction to the jury. BCM and Nawlins argue that the jury was confused and the confusion was compounded by the supplemental instruction which stated (emphasis supplied):

> Under the detrimental reliance doctrine in Louisiana law, a **party** is permitted to recover for economic harm whenever the **defendant** made a representation by word or conduct upon which the **plaintiff** justifiably relied and because of which the **plaintiff** changed his position to his detriment. This is because the basis of the detrimental reliance doctrine is designed to prevent injustice by barring or stopping a **party** from taking a position contrary to his prior acts, admissions, representations, or silence.

> Okay. The law states that, when silence is asserted as a grounds for detrimental reliance, a duty to speak must exist. For such duty to speak to exist, there must be proof that: one, the defendant had the opportunity to speak or act; two, the defendant had full knowledge of the facts, circumstances, and understandings between the parties; three, the defendant intended to mislead or at least had a willingness that the plaintiff be deceived; four, the plaintiff must have been ignorant of and without convenient or ready means of learning the true facts, circumstances and understandings of the parties; and, five, the plaintiff must have been misled into doing what he would not have done except for the silence of the defendant.

6

BCM and Nawlins argue the bold-faced words created the jury confusion regarding the law on detrimental reliance. They claim that the use of the word "party" as opposed to simply "plaintiff" and "defendant" created the confusion because "party" referred to the plaintiff in the first instance and to the defendant in the second instance.

CNO argues that the confusing language in the supplemental instruction was carried over directly from the charge previously submitted to the court by BCM and Nawlins. This is the same instruction that BCM and Nawlins argue on appeal that the trial judge erred in not using to charge the jury on detrimental reliance. In support of this contention, CNO argues that BCM and Nawlins only objected to the second part of the supplemental charge and not the portion that they claim on appeal is defective. Counsel for BCM and Nawlins notes that he was not trial counsel, but in reviewing the colloquy between trial counsel and the judge, he observes that there was an objection made. He argues it is unclear what part of the detrimental reliance instructions were objected to.

A review of the entire colloquy between the trial judge and counsel about the jury's confusion reveals that the judge first reviewed the requested jury charges from both sides on detrimental reliance. Then they discussed the charges. The transcript reveals that trial counsel for BCM and Nawlins specifically had no objection to the specific part of the supplemental jury charge now complained of on appeal and the wording to be used:

> MR. CHEATWOOD: We wouldn't have any problem with stopping after the first sentence you read: Designed to prevent injustice by barring a party from taking a position contrary to his prior - -
>
> THE COURT: But you have the same exact sentence in yours: This is because the basis of the detrimental reliance doctrine is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, or representations, or silence.

7

MR. CHEATWOOD: And I'm saying, I don't have a problem with that sentence at all, in Mr. Kutcher's or in mine. It's the next part that bothers me.

MR. KUTCHER: What, a condition precedent?

MR. CHEATWOOD: Right. Talking about promises when we're talking about silence and inaction.

We have reviewed the entire exchange between counsel and the court, and we agree with CNO that BCM and Nawlins failed to object to the part of the jury charge now complained of and cannot now complain about it on appeal. See La.Code Civ.P. art. 1793(C).

Jury Charge on Conversion

CNO claims that the jury charge on conversion submitted to the jury denied it the affirmative defense that implicit or explicit consent or ratification vitiates conversion regardless of the way it is committed. The trial judge charged the jury as follows on conversion:

> Louisiana law provides a remedy called conversion for unlawful interference with the ownership or possession of property. Among the ways that conversion can be committed are: One, possession of property acquired in an unauthorized way; two, the property is removed from one place to another with the intent to exercise control over the property; three, possession of the property is transferred without authority or consent; four, possession is withheld from the true owner or possessor; or, five, property is altered or destroyed.

CNO argues that this jury instruction allowed the jury to believe that BCM's and Nawlins' implied consent was not a defense when considering whether a conversion had been committed.

The law is clear that:

> A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership

8

is asserted over the chattel.

*Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 98-343, pp. 4- 5 (La. 12/1/98), 721 So.2d 853, 857 (*citing* FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 1-2, at 3 (1996 & Supp.1998)).

While the jury charge does not specifically mention implied consent, it does state that "possession of the property is transferred without authority or consent." The instruction when read as a whole indicates that conversion occurs when a party does not have permission to use the property of another. We find that the trial judge's instruction on conversion correctly stated the law.

## JUROR MISCONDUCT

BCM and Nawlins contend that one of the jurors expressed prejudicial comments about Mr. Louis Viviano during deliberations which in effect "poisoned" the jury. In support of this argument, they offered the affidavit of the jury foreperson. The trial court denied their motion for new trial on this issue.

The law is clear that affidavits and other testimony of jurors cannot be used to impeach the jury's verdict. *Uriegas v. Gainsco*, 94-1400 (La.App. 3 Cir. 9/13/95) 663 So.2d 162, *writ denied*, 95-2485 (La. 12/15/95), 664 So.2d 458; *Theriot v. Theriot*, 622 So.2d 257 (La.App. 1 Cir.), *writ denied*, 629 So.2d 1138 (La.1993); *Williams v. Super Trucks, Inc.*, 36,993, 36,994 (La.App. 2 Cir. 4/9/03), 842 So.2d 1210, *writ denied*, 03-1303 (La. 9/5/03), 852 So.2d 1042; *Coleman v. Brooks*, 583 So.2d 133 (La.App. 4 Cir. 1991). "[I]nvasive scrutiny of a juror's individual deliberation or investigation of a jury's collective reasoning for reaching a verdict are disfavored in the law as a matter of public policy." *Uriegas*, 663 So.2d at 170-71. "The reason for this rule is to promote the jury's discovery of the truth by preventing litigants from invading the privacy of the jury room." *Id.*

It would be improper for the trial court to consider this affidavit to overturn a jury verdict. Furthermore, the jury process is such that the jury should be allowed to deliberate and express opinions without worry that its opinions would be subject to scrutiny. There were twelve people on this jury, and many probably had varying opinions about the parties involved in the litigation. The trial judge did not err in his ruling.

## CONVERSION

CNO contends that the jury's finding that conversion occurred was manifestly erroneous, as there was no evidence presented to support such a finding. It argues that CNO operated the restaurants with the consent of Mr. Viviano for just over a two-week period following the dissolution of the temporary restraining order. They claim that, at the very least, no steps were taken to prevent CNO from continuing to operate the restaurants while negotiations to keep the restaurants open were ongoing. In response to this argument, BCM and Nawlins contend that there was sufficient testimony in the record to allow the jury to conclude that products and equipment were removed without their consent.

A trial court's factual determination is subject to the manifest error standard of review. *Bellard v. Am. Cent. Ins. Co.*, 07-1335, 07-1399 (La. 4/18/08), 980 So.2d 654. The issue to be resolved by the reviewing court is whether the fact finder's conclusion was a reasonable one. *Id*.

Conversion consists of an act in derogation of plaintiff's possessory rights. *Angelo and Son, Inc. v. Rapides Bank & Trust Co.*, 95-992 (La.App. 3 Cir. 4/10/96), 671 So.2d 1283, *writs denied*, 96-1173, 96-1204 (La. 6/21/96), 675 So.2d 1083. Any wrongful exercise or assumption of authority over another's goods, depriving him of possession, permanently or for an indefinite period of time, is conversion. *Id*.

10

Mr. Viviano testified that the restaurants were kept open after the dissolution of the temporary restraining order because he thought the parties could work things out. However, CNO never asked if they could use anything. After the restaurants were closed on November 2, 1997, the electrical and water utilities were still on, but the coolers had been turned off and fresh food had been left to spoil. All dry goods and proprietary goods had been removed. The payroll records were also gone.

Chris Rodrique, who had been an area supervisor and director of operations for CNO, also testified. He stated that he was instructed to send a team over to the restaurants to get the payroll records, so they could pay people when CNO ceased operating the restaurants. He also testified that there was some inventory that had been purchased, mostly food and liquor, that also needed to be removed. Scott Johnson went to Orlando and Pat Lynch went to Lafayette to carry out these duties.

Pat Lynch became the area supervisor of the Lafayette and Orlando restaurants for CNO. When CNO took over the restaurants about a month before closure, he was responsible for ensuring that they continued to operate in a Copeland's fashion. He testified that he got a call the night the restaurants closed. Some food was taken out of the restaurant and put on a truck. Alcohol was also removed. These items were taken to other Copeland's restaurants.

Scott Johnson was the area supervisor responsible for closing the Lafayette restaurant. A refrigerated truck was waiting to remove items from the store. The managers loaded the regular closing period inventory on the truck. He made a copy of the Excel spreadsheet showing the inventory onto a disk. Employee files and payroll records were also removed. Inventorying and loading of the truck took several hours.

11

Mr. Bryant Angelle, II, a computer consultant, also testified. He went with Mr. Viviano to the Lafayette restaurant about four to five months after the restaurant was closed. There were three computers: two were networked and one was a standalone. One of the networked computers was not running, and a couple of files were missing on the other one. He was able to ascertain that the touch-screen program for placing orders had last been accessed on November 7. Payroll and tip schedule files were last accessed on November 8 but were no longer on the server.

Richard Talluto was a chief financial officer for Al Copeland Investments. He testified that the agreement for CNO to keep the restaurants open called for the rents, utilities, equipment notes, etc., to be paid. However, since BCM and Nawlins owed CNO money, it decided to offset the debt as a way of collecting the money.

From the evidence as a whole, we find it reasonable for the jury to conclude that while BCM and Nawlins consented to CNO continuing to operate the Lafayette and Orlando restaurants, there was no agreement that it could use the property in the restaurants without paying for it. This includes food, liquor, and computer programs and records. One can assume from the suspicious removal of the property in the middle of the night that CNO was trying to get the property and records before it could be stopped.

CNO additionally argues that the sums awarded for conversion was erroneous. The jury's awards relative to conversion were based on expert testimony. CNO complains that BCM's and Nawlin's experts methodology and determinations were defective.

A fact finder's evaluation of expert testimony and resolution of conflicts is also subject to the manifest error standard of review. *Bellard*, 980 So.2d 654.

Philip Garrett, an expert in business and financial accounting, testified on behalf of BCM and Nawlins. The occupancy and operating costs were based on an average of the previous thirteen periods. The inventory amounts came from the October 5, 1997 balance sheet and general ledgers of the restaurants. The software cost was from a depreciation schedule. His calculations for Lafayette included $24,880 in occupancy costs, $50,147 in operating costs, $16,678 in inventory, and $32,484 for the deleted software. His calculations for Orlando included $23,063 in occupancy costs, $48,603 in operating costs, $16,943 in inventory, and $31,221 for the deleted software. Other than the inventory, CNO claims that the other calculations are factually unsupported.

CNO argues that the operating costs are wrong because Mr. Garrett admitted he used an average of costs versus looking at an actual bill to determine the amount. It also complains that Mr. Garrett admitted the figure included a 2.25% advertising fee payable to CNO, which BCM and Nawlins were not responsible for since the franchises were terminated. CNO further questions the amount because Mr. Viviano listed occupancy and operating costs on bankruptcy schedules at a lower amount. Further, it claims that Mr. Garrett used replacement cost for the software when he should have used a depreciated value.

The jury was allowed to hear CNO's questioning of Mr. Garrett and how he determined the conversion costs. Mr. Garrett explained that he used replacement cost for the software because you assume the software would be replaced. Mr. Garrett agreed that the advertising fee should not be included if BCM and Nawlins did not have to pay the fee. However, Mr. Garrett was never asked to recalculate without the advertising fee, so the jury had no evidence of what this number would be. Furthermore, there was no evidence that Mr. Garrett helped Mr. Viviano prepare the

13

amounts included in bankruptcy schedules.

Obviously, the jury determined that Mr. Garrett's calculations were the best supported evidence of the amount of conversion damages. He thoroughly explained his basis and was cross-examined on every item. We cannot say that the jury's awards were manifestly erroneous.

## OFFSET

Lastly, CNO argues that the trial court erred in failing to offset any sums owed by BCM and Nawlins under the prior judgment. CNO argues that this court should follow the Louisiana Supreme Court's decision in *Levy v. Roos*, 32 La.Ann. 1029 (La.1880), which relied on former La.Civ.Code art. 2210 and held that judgments may be set-off against each other, whether the claims upon which they were recovered could have been or not.

Present La.Civ.Code art. 1894 provides, in pertinent part:

> Compensation does not take place, however, if one of the obligations is to return a thing of which the owner has been unjustly dispossessed, or is to return a thing given in deposit or loan for use, or if the object of one of the obligations is exempt from seizure.

Comment (b) to this article explains, the "wrongdoers or parties who have acted in bad faith are not allowed to set up the plea of compensation."

In *Levy*, 32 La.Ann. 1029, the plaintiff filed suit against a surety to recover damages based on a judgment against the surety in a previous case for the wrongful issuance of attachment. The surety answered claiming compensation because the judgment he was being sued on was extinguished by a judgment rendered in the same case against the plaintiff by the party the surety was responsible for. The supreme court held that the original causes or considerations on which the previous two judgments were based were merged in the judgments themselves. Thus, the wrongful action was no longer an existing cause of action at the time of the suit.

14

In the present case, the cause of action for conversion had not been reduced to judgment at the time CNO pleaded offset. The law is clear that set-off is not allowed in a suit for wrongful conversion. *Aldredge v. Moses*, 595 So.2d 379 (La.App. 3 Cir. 1992); *Hebert v. First Guar. Bank*, 493 So.2d 150 (La.App. 1 Cir. 1986); *Neff v. Ford Motor Credit Co.*, 347 So.2d 1228 (La.App. 1 Cir. 1977). We find that the trial court did not err in failing to offset the prior judgment against this award for conversion damages.

For the reasons set forth in this opinion, we affirm the judgment of the trial court. All costs of this appeal are to be split half to the Copeland parties and half to BCM and Nawlins.

**AFFIRMED.**